# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR16-2048-LTS |
| vs. | **ORDER** |
| DAYTOVIANE DAPREE McLEMORE, | |
| Defendant. | |

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR16-2050-LTS |
| vs. | **ORDER** |
| JOSHUA ADAM RODE, | |
| Defendant. | |

_____

This matter is before me on a Report and Recommendation (R&R) (CR16-2048, Doc. No. 44; CR16-2050, Doc. No. 33) in which the Honorable Jon Stuart Scoles, then-Chief United States Magistrate Judge, recommends that I deny defendants' motions to suppress (CR16-2048, Doc. No. 27; CR16-2050, Doc. No. 19).[1]

---

[1] Although they are charged in separate indictments, the evidence McLemore and Rode seek to suppress arose out of the same incident. Accordingly, Judge Scoles consolidated his rulings on the motions to suppress into one order, which he filed in both cases. Since they are identical, I will simply reference them as the R&R. The parties' motions to suppress are also largely similar, with only stylistic differences. I will refer to them jointly as the "motion to suppress" unless a distinction is warranted.

# I. APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## II. BACKGROUND

### A. *Procedural History*

On October 18, 2016, the grand jury returned indictments (CR16-2048, Doc. No. 2; CR16-2050, Doc. No. 2) charging each defendant with one count of unlawful possession of a firearm by a drug user. The defendants filed their motions to suppress on November 21, 2016, and November 23, 2016. The Government filed a resistance (CR16-2048, Doc. No. 31; CR16-2050, Doc. No. 24) on December 1, 2016. Judge Scoles conducted a hearing on December 16, 2016, and issued his R&R on December 21, 2016. Both defendants filed timely objections (CR16-2048, Doc. No. 51; CR16-2050, Doc. No. 36).[2] The defendants than appeared before Chief United States Magistrate Judge C.J. Williams and entered conditional guilty pleas. CR16-2050, Doc. No. 46; CR16-2048, Doc. No. 64. Both guilty pleas are currently pending before me based on R&Rs from Judge Williams. *Id*.

### B. *Relevant Facts*

Based on my de novo review of the facts, which included reviewing the transcript of the hearing, Government exhibit 1 and defendants' exhibits A through L, I find the following facts.[3]

Waterloo, Iowa, police officer Diana Del Valle responded to a call of shots fired on June 29, 2016, near the 800 block of Logan Avenue. Tr. at 14. However, Del Valle later testified that the reported shots were fired from the Newell Sanders Funeral area, approximately the intersection of Newell Street and Fourth Street in Waterloo. Tr. at

---

[2] There is some distinction in the substance of the defendants' objections. For example, McLemore objects to the R&R's findings of fact, while Rode does not. Thus, the objections will be addressed separately as needed.

[3] While the transcript is filed in both cases, my citations to the transcript refer to CR16-2050, Doc. No. 28.

29. Thus, it appears that although the shots were reported near the Newell Sanders Funeral area, Del Valle responded to the area of 800 Logan because of her previous experience with gangs in that area and her desire to monitor gang activity. *See* Tr. at 14-16, 29-30. However, this testimony is not clear. What is clear is that upon being informed that shots were fired, Del Valle suspected a gang altercation between the "L Block Gang" and members of the "Hood" gang. Tr. at 16. Believing the shots to be a result of a feud between the two gangs caused Del Valle to respond in the way that she did, proceeding directly to the area where she believed the suspects might be located rather than to the scene of the shooting. *Id*.

Once in the Logan Street area, Del Valle saw a dark-colored BMW automobile traveling south on East Mullan Street. Tr. at 17. Within an hour, Del Valle saw the BMW three times. However, because it was not the vehicle described in the initial bulletin, Del Valle did not stop it. *Id*. The last time Del Valle observed the vehicle that night, she saw two people exit it, including Rode.[4] Del Valle testified that after she reported seeing Rode to other officers, she was informed that one officer had seen the

---

[4] Del Valle initially testified that she recognized Rode by sight on June 29, 2016, but later clarified that although she had known McLemore for quite some time, she only learned of Rode "when this incident occurred." Tr. at 24. Del Valle testified she was informed by other officers that Rode was affiliated with the "L Block" gang. Tr. at 19. Judge Scoles wrote:

> Officer Del Valle was asked on direct examination whether "[a]t that time did you recognize either of those individuals?" Del Valle responded that she recognized one of them as Joshua Rode. Del Valle testified that she looked at Rode's photograph on the computer in her car as they approached the 900 block of Logan Avenue and recognized him as the person going into the house. Sergeant Richter, who was in the car with Del Valle, testified he could not recognize either person. In her report, Del Valle suggests she first learned Rode's identity later that night. I don't find the inconsistency material to the issues now before the Court.

CR16-2050, Doc. No. 33 at 3.

BMW driving the wrong way down a street shortly after the shooting, and that another officer had received a tip that Rode had been shot days earlier but did not seek medical treatment. Tr. at 18-20. Most important to the issues now pending, Del Valle testified that she took note of the BMW's dealer plates.[5] Tr. at 30. Additionally, on one instance when she saw the vehicle, it was parked. Tr. at 62. Del Valle stated she was sitting in the passenger seat of a squad car as it passed the parked BMW. Tr. at 65. However, even though she was within feet of vehicle, she testified that she did not look at the temporary registration tag located in the rear windshield area. Tr. at 65.

Del Valle saw the BMW again a few days later, on July 1, 2016, at approximately 8:15 p.m. Tr. at 20-22. On that night, Del Valle had been directed by Sergeant Kye Richter to stay in the area of the BMW because law enforcement hoped to stop it. Tr. 37-39. Del Valle testified that she was following the BMW closely, approximately seven to ten feet away, but that she could not read temporary license plate that was lawfully affixed to the rear windshield. Tr. at 21. Accordingly, Del Valle conducted a traffic stop. She testified that once she stopped the vehicle, she walked up to the vehicle from behind and could read the temporary tag once she was near the trunk area. *Id*.

The events from the few moments leading up to the traffic stop are also covered by defendants' exhibit A, a law enforcement recording of the incident. Judge Scoles described what was recorded:

> As Officer Del Valle was following the BMW, Sergeant Richter and Officer Sullivan, who was riding with him, conducted an unrelated traffic stop. Del Valle told Richter on the radio that she had seen "no violations yet." Sullivan asked Del Valle about the license plate. The BMW had a dealer advertising plate where the metal plate would generally be located, with a temporary paper plate in the back window. Del Valle told Sullivan that "you can see a plate, but you can't read what's on it." Sullivan responded "there you go." "Officer Del Valle testified that she followed the car for

---

[5] There is no dispute in the record that the BMW was properly licensed. It had proper temporary tags that were legally affixed.

5

> "about a block-and-a-half," drove within seven to ten feet of the BMW, and could still not read the paper plate. When asked on cross-examination whether she used her spot light, Del Valle testified it was "likely," but "I'm not sure." She did not use her high beams.

CR16-2050, Doc. No. 33 at 5 (citing Def. Ex. A). Prior to the stop, Del Valle's comment "you can see a plate, but you can't read what's on it" was in response to Richter's prompting question, "can you read their plate through the back window?" Additionally, although Del Valle's car was equipped with a front view camera, she testified that, "unfortunately, you cannot see the front view of that camera for some reason." Tr. at 27.[6]

---

[6] This omission is particularly noteworthy in light of other testimony given by Del Valle. Judge Scoles wrote: "At the hearing, Officer Del Valle was asked why the recordings between herself and Sergeant Richter were incomplete, and she responded: 'Because Sergeant Richter advised he covered the initial pretext of the stop.' Hearing Transcript (McLemore docket number 37) at 39:17-18." CR16-2050, Doc. No. 33 at 11, n. 10. Judge Scoles reasoned that, "[i]n responding to the next question, however, Del Valle is apparently referring to information that was not included in her report. In any event, it does not appear that Del Valle was using the term 'pretext' as a term of art." *Id*. I am unable to adopt Judge Scoles' conclusion. Defense counsel clearly asked Del Valle about the short duration of the audio/visual recordings, and why they did not contain the additional discussion leading up to the stop. Del Valle pointedly failed to answer that question. Tr. at 39. Her only explanation was that Richter had covered the pretext for the stop. In context, it is clear that her reference to "pretext" referred to the short piece of audio in which Richter said "there you go." This is made clearer upon the next question, when defense counsel redirected Del Valle back to the issue of the audio/visual recordings and she indicated that she discussed the recordings with Richter. Tr. at 40. Also, based on totality of this situation, it is clear that Del Valle understood the legal significance of "pretext" in the context of a traffic stop, considering her conversation with Richter on the audio recording in which they discussed possible legal violations that could provide a reason to stop the vehicle. Additionally, Del Valle was later asked if she checked the validity of the tag immediately after existing her squad car. She answered in the negative, stating that "initially as I approached the vehicle, I already had the probable cause, which was a temporary tag. I wasn't focused on whether that tag was valid or not at that time." Tr. at 43.

Once Del Valle stopped the vehicle, she approached the driver, who turned out to be Rode. McLemore was also in the vehicle. Tr. at 22. Del Valle indicated that the defendants appeared nervous and that she smelled marijuana.[7] *Id*. at 23-24. She and Richter decided to conduct a pat down of the suspects. Del Valle explained that they patted down the suspects because:

> No. 1 was that Rode -- I could smell the odor of marijuana coming from the vehicle. I could -- at that time I wasn't certain if it was Rode or McLemore or it was just in the vehicle. The second thing was that I identified Rode as an L Block gang member, but Daytoviane McLemore in specific was someone we knew who was shot at in April who had an ongoing feud with the Hood gang and particularly one person that we knew about. We knew he was carrying weapons based on that information or information we had received. I also had conducted a search warrant on [McLemore's] phone in January where there was several conversations about selling or buying guns.

Tr. at 25-26. During the pat down, Richter discovered a gun on McLemore.

## C. *Judge Scoles' Findings*

The defendants raise three arguments. First, the stop was not lawful because there was no reasonable suspicion of criminal activity. Second, the stop was unlawfully prolonged. Third, the pat down was not lawfully authorized.

Regarding whether the stop of the vehicle was proper, Judge Scoles set out the proper standard and stated:

> Iowa Code § 321.25 permits a vehicle to be lawfully operated for a period of 45 days after the date of delivery of the vehicle to the purchaser from the dealer, "if a card bearing the words 'registration applied for' is attached on the rear of the vehicle." ... Officer Del Valle credibly testified she was

---

[7] As Judge Scoles noted: "Del Valle testified that as she 'approached' the car she could smell 'an odor of fresh marijuana.' In her report, however, Del Valle wrote that '[i]n speaking with Rode, I detected an odor of fresh marijuana coming from the vehicle.'" Doc. No. 33 at 6, citing Def. Ex. B at 1.

7

unable to read what appeared to be a temporary registration card in the window of the BMW. McLemore's Exhibit E supports her testimony in that regard. Given the angle of the rear window, the placement of the temporary registration card, and the lighting conditions, I believe Del Valle was unable to read the paper plate until after she stopped and approached the vehicle. The officer in *Givens* stopped a vehicle under similar circumstances. The Court in *Givens* concluded that no constitutional violation occurred. *Givens*, 763 F.3d at 991 ("because *Givens's* vehicle did not have metal license plates and lacked a readily apparent temporary paper registration card, Officer Baughan had reasonable suspicion that the vehicle did not comply with state law"). For the same reason, I believe Officer Del Valle's stop of the BMW was constitutionally permitted.

CR16-2050, Doc. No. 33 at 7, 12.

As for prolonging the traffic stop, Judge Scoles stated:

> The "mission" of the traffic stop in this case was to determine whether the BMW was displaying a valid temporary registration card. I believe an investigation of that issue requires more than simply glancing at the card and judging its apparent validity. In my view, under these circumstances, an appropriate investigation includes speaking with the driver, determining whether the vehicle was recently purchased, and establishing the apparent validity of the temporary registration card. Accordingly, Officer Del Valle's "mission" was not complete until she spoke with the driver and, therefore, approaching the driver did not improperly prolong the stop or violate the holding in *Rodriguez*.

> Even *if* one concludes that the mission of the stop was complete after viewing the temporary registration card in the window, I could not find any authority which would require the officer to simply turn on his or her heel and return directly to the squad car. That is, *Edgenon* - which held a driver could not be required to produce her driver's license - found that "as a matter of courtesy," the officer should have explained to the driver the reason for the stop. While *Edgenon* held the officer was not permitted to require the driver to produce a license and registration as a part of the initial stop, it recognized the possibility that circumstances during the brief encounter between the officer and the driver "might independently give rise to facts creating reasonable suspicion of criminal activity, thus warranting further investigation." 438 F.3d at 1051. . . .

8

In summary, I do not believe the "mission" of the stop was completed when Officer Del Valle walked up to the BMW and would have been able to read the temporary registration card. Instead, I believe an appropriate investigation would have allowed her to speak with the driver. Even if the mission of the stop was completed at that time, however, I could find no authority for the argument that Del Valle was required to simply return to her squad car. Edgerton suggested that under similar circumstances the officer should approach the driver and explain the reason for the stop. Either way, when Del Valle approached Rode, observed his demeanor, and smelled the odor of fresh marijuana, there was reasonable suspicion of criminal activity and she was authorized to expand the vehicle stop. I find no constitutional violation.

CR16-2050, Doc. No. 33 at 15, 17.

Regarding the pat down, Judge Scoles wrote:

Here, Sergeant Richter knew that both Rode and McLemore are associated with the L Block gang. Gang affiliation is a factor the Court may consider in determining whether it was reasonable to believe McLemore was armed and dangerous. *United States v. Feliciano*, 45 F .3d 1070, 1074 (7th Cir. 1995) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful evidentiary value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, it is a permissible component of the articulable suspicion required for a Terry stop.") (quoted with approval in *United States v. Roelandt,* 827 F.3d 746, 749 (8th Cir. 2016)). As a member of the Violent Crimes Apprehension Team, Richter knew that the L Block gang had been feuding with opposing gangs in Waterloo. There was a shooting just two days earlier, with 8-10 shots fired, in the area where Rode and McLemore lived. A few days before that, Rode had allegedly been shot at near his home. Two months earlier, McLemore was shot in the foot as he was standing in front of his home. Furthermore, Richter knew from an earlier search of McLemore's phone that McLemore may be involved in the buying and selling of guns.

Prior to ordering Rode and McLemore to exit the vehicle, Officer Del Valle smelled the odor of fresh marijuana coming from the vehicle. An earlier search of the residence where McLemore was living, and a subsequent search of his phone, suggested McLemore may be distributing marijuana. "It is reasonable for an officer to believe a person may be armed

9

and dangerous when the person is suspected of being involved in a drug transaction." *United States v. Gaffney*, 789 F.3d 866, 870 (8th Cir. 2015) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005)). Moreover, Rode appeared extremely nervous. Extreme nervousness may bolster an officer's belief that a subject may be armed and dangerous. *Gaffney*, 789 F.3d at 870 (quoting *United States v. Hanlon*, 401 F.3d 926, 930 (8th Cir. 2005)). Furthermore, it appeared to Sergeant Richter that Rode was attempting to conceal the contents of the glove compartment as he reached for the car's purchase papers.

The level of suspicion necessary to justify a protective pat-down search "is considerably less than proof of wrongdoing by a preponderance of the evidence" and "is obviously less demanding than that for probable cause." *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Traffic stops are 'especially fraught with danger to police officers,' so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." Rodriguez, 135 S. Ct. at 1616 (internal citation omitted). Given all of the circumstances, I believe that a "reasonably prudent man" would be warranted in believing that his safety or the safety of others may be in danger. *Terry*, 392 U.S. at 27. Accordingly, I believe Sergeant Richter was authorized to conduct a protective pat-down for officer safety.

CR16-2050, Doc. No. 33 at 18-19.

### III. DISCUSSION

In their objections, defendants raise three arguments. First, both Rode and McLemore argue that the officers did not have reasonable suspicion to stop the vehicle based on the temporary registration. CR16-2050, Doc. No. 36; CR16-2048, Doc. No. 51-1 at 4. Second, McLemore argues that Judge Scoles also erred regarding the issues of the prolonged stop and the pat down. CR16-2048, Doc. No. 51-1 at 6-8.

A.  *Pat Down*

   1.  *Standard*

   > "Officers may conduct a protective pat-down search for weapons during a valid stop … when they have objectively reasonable suspicion that a person with whom they are dealing might be armed and presently dangerous and criminal activity might be afoot." *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) (internal quotation marks omitted). "In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." *Id*. "[A] pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. (internal quotation marks omitted).

*United States v. Gaffney*, 789 F.3d 866, 870 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1229 (2016). The courts have considered a variety of factors which may give rise to reasonable suspicion to conduct a pat down. For example, it is reasonable for a police officer to believe that the individual may be armed and dangerous it they are suspected of engaging in drug trafficking. *United States v. Robinson*, 119 F.3d 663, 667 (8th Cir. 1997). *See also United States v. Bustos–Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."). Additionally factors that favor a pat down include presence in a high crime area, nervousness, and suspicion of gang activity. *United States v. Roelandt*, 827 F.3d 746, 748 (8th Cir. 2016).

   2.  *Discussion*

Contrary to McLemore's perfunctory objection, if the stop of the vehicle was otherwise legal, the officers clearly had a right to conduct a protective pat down. The officers suspected the presence of drugs based on the odor of marijuana coming from the defendants. The officers also had a prior reason to believe McLemore was involved in

gang activity and drug activity. *See* Def. Ex. C. Further, the defendants appeared to be nervous. *See* Def. Ex. B and C. There was also evidence that Rode and recently been shot and the BMW had been seen leaving the scene of a prior shooting. *Id*. Accordingly, a reasonably prudent person in the circumstances of these officers would have suspected that the defendants may have been in possession of weapons. If the stop was otherwise legal, the pat down search was justified.

## B.     Pretext

The next issue is whether the officers had reasonable suspicion to justify their stop of the vehicle.

### 1.     Standard

"The Fourth Amendment guarantees the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' U.S. Const. amend. IV. A traffic stop constitutes a seizure for Fourth Amendment purposes. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). To constitute a reasonable seizure, a traffic stop must be supported by, at a minimum, 'a reasonable, articulable suspicion that criminal activity' is occurring. *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001)." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011). The Eighth Circuit recently set out the standard regarding traffic stop cases:

> "Pretextual traffic stops are a violation of the Fourth Amendment." *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993). However, if police observe a traffic violation, no matter how minor, there is probable cause to stop the vehicle. *United States v. Mendoza*, (8th Cir. 2012); *Eldridge*, 984 F.2d at 948. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) (quotation omitted). "Similarly, it is

> irrelevant that the officer would have ignored the violation but for his ulterior motive." *Id*.

*United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016).

### 2. *Analysis*

Several facts are beyond dispute. The first is that law enforcement set out to stop the BMW driven by Rode and McLemore on the night of July 1, 2016, because the officers believed it had been at the scene of the June 29, 2016, shooting. The recordings and Del Valle's testimony confirm as much. It is also settled law that the officer's subjective desire to find a pretext for a stop does not render the stop unlawful *if* illegal activity is occurring. *See United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) ("So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop."). In many alleged pretext cases, this is the end of the inquiry because the officers are able to point to an actual violation committed by the driver. However, in this case no violation occurred.

Iowa Code § 321.25 sets out the requirements for using a temporary registration on a motor vehicle. It is undisputed that the BMW at issue here was in compliance with this code section and had a temporary registration attached in the appropriate location. The reason for the stop was Del Valle's alleged inability to the read the temporary registration, not any actual infraction.

As Judge Scoles noted, the Eighth Circuit Court of Appeals has addressed the issue of whether an officer who cannot see a temporary Iowa registration may stop the vehicle based on reasonable suspicion of criminal activity. In *United States v. Givens*, 763 F.3d 987 (8th Cir. 2014), an officer stopped a vehicle because he could not read the temporary tags. The court affirmed the denial of the defendant's motion to suppress, stating:

The district court, in adopting the report and recommendation of the magistrate judge, expressly found that Officer Baughan, before stopping the vehicle, could only see what appeared to be a temporary paper registration card in the rear window, but did not know whether the paper was in fact a registration card. This finding is critical, particularly because we have previously upheld a traffic stop under conditions where a vehicle did not display a metal license plate and the officer saw only what appeared to be a paper tag posted in the rear window, but did not know whether the paper affixed to the window was a valid registration tag. *United States v. Mendoza*, 691 F.3d 954, 959 (8th Cir. 2012), *cert. denied*, --- U.S. ---, 133 S.Ct. 965, 184 L.Ed.2d 749 (2013) and *cert. denied*, --- U.S. ---, 133 S.Ct. 966, 184 L.Ed.2d 750 (2013).

Officer Baughan credibly testified that his suspicion arose because he could not determine whether the paper affixed to the rear window was a valid temporary registration card. In his experience, temporary registration cards are generally legible when observed from his patrol car and Officer Baughan testified that he had on prior occasions been able to read temporary registration cards at nighttime. Based on Officer Baughan's testimony and experience, we conclude it was objectively reasonable for Officer Baughan to expect that a properly displayed valid registration card would be readable from his location. *See United States v. Sanchez*, 572 F.3d 475, 479 (8th Cir. 2009) (determining that it was objectively reasonable for the officer to "expect that the name of the issuing jurisdiction would appear conspicuously on the face of an official document, and to investigate further if a name was not visible"). Because he could not decipher any information on the paper affixed to the rear window, Officer Baughan reasonably suspected that the vehicle lacked valid registration. It is not uncommon for officers to stop vehicles due to the lack of an apparent temporary registration tag, and such stops are generally upheld as supported by reasonable suspicion. *See, e.g.*, *United States v. Edgerton*, 438 F.3d 1043, 1047–48 (10th Cir. 2006) (holding the officer possessed reasonable suspicion to stop the vehicle because the vehicle's assigned registration was not readily apparent, leading the officer to question whether the paper affixed to the window was in fact a temporary registration tag); *United States v. Tipton*, 3 F.3d 1119, 1122 (7th Cir.1993) ("The driver's failure to display prominently a registration sticker, alone, would provide an officer with reasonable suspicion sufficient to justify, at the very least, an investigatory stop.").

*Givens*, 763 F.3d at 990–91. Thus, a reasonable suspicion of criminal activity related to a temporary registration can give rise to a permissible traffic stop, even if turns out that registration is valid.

However, the defendants argue, and I agree, that the present case is distinguishable from *Givens*. Indeed, the *Givens*' court distinguished a case that is similar to this case. Discussing *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000), the *Givens* court stated:

> In *Wilson*, the officer observed a vehicle traveling with a paper registration tag but could not determine the expiration date, which appeared to be "a function of the darkness and the small space provided for writing in the date." *Id*. at 722–23. The officer performed a traffic stop to determine whether the registration had expired. *Id*. The Fourth Circuit, sitting en banc, reversed the district court's determination that the stop was valid. *Id*. at 724. The court noted that "the officer testified that he had no suspicion at all—that Wilson was driving without a license, operating an unregistered vehicle, or otherwise violating the law." *Id*. at 723. The court also reasoned that:
>
>> [t]here was nothing illegal about the operation of the vehicle, and nothing appeared illegal about the temporary tag. It was dark, and both cars were moving. Although Officer McLemore could not see the written-in expiration date on the tag, that appears to have been a function of the darkness and the small space provided for writing in the date. There is no evidence that the temporary tag was illegible or in any way obliterated, smudged, or faded.
>
> *Id*. (internal quotation marks omitted). The court concluded that upholding a traffic stop under the circumstances where the officer saw nothing wrong and suspected nothing "would permit the police to make a random, suspicionless stop of any car with a temporary tag" and "[t]he Fourth Amendment does not afford the police such unbridled discretion." *Id*. at 724.
>
> Unlike the officer in *Wilson*, who observed a valid temporary tag but simply could not read the expiration date, Officer Baughan could not determine whether the paper affixed to the rear window of Givens's vehicle was in fact a temporary registration card. Moreover, Officer Baughan

15

indicated that he is often able to read temporary cards at night despite dark conditions. This directly contrasts with the officer in *Wilson* who admitted that the inability to completely read temporary tags was common in his experience, making suspicion of wrongdoing less likely in that case.

*Givens*, 763 F.3d at 991.

While the officer in *Givens* was able to articulate a suspicion of an actual crime (failure to have proper temporary registration), the officers in this case make no such claim. In her report, Del Valle stated:

> I observed the BMW had promotional/advertising dealer plates and I observed a paper plate affixed to the left portion of the rear window, but I was unable to see the letters or numbers on the paper plate from my vehicle, or when even when I got close to the vehicle. It wasn't until I was standing near the rear window, when I was able to see the paper plate.

Def. Ex. B at 1. Del Valle did not state that that she suspected Rode or McLemore were violating Iowa Code § 321.25 by not having proper registration. *See* Def. Ex. B. Similarly, the audio recording reflects no discussion suggesting that Del Valle or Richter suspected fraudulent registration. *See* Def. Ex. A. Rather, the conversation shows that the officers were looking for a pretext to stop the vehicle and that Richter specifically directed Del Valle to scrutinize the temporary registration *that both officers knew to be a temporary registration*. *Id*. At that point, Del Valle stated that because of darkness she could not read the registration. *Id*.

Moreover, Del Valle's testimony contains no indication that she actually suspected a motor vehicle registration infraction. Rather, as quoted above, when asked whether she even glanced at the temporary registration, she stated, "as I approached the vehicle, I already had the probable cause, which was a temporary tag. I wasn't focused on whether that tag was valid or not at that time." Tr. at 43. Del Valle also openly referred to the temporary tag as a pretext for the stop. There is no contemporaneous record that Del Valle ever articulated a suspicion that Rode or McLemore were committing a traffic code violation based on the temporary tag.

This is the precise factual situation that occurred in *Wilson* and that the Eighth Circuit relied upon in distinguishing *Givens*. In *Givens*, the officer plausibly explained why he believed a crime might have been occurring. He stated that he typically could read temporary tags at night, that he could not read Givens' tag, and that there had been a rash of fraudulent tags. There are no similar facts here. Thus, *Givens* is not controlling. The record in this case contains no evidence that the traffic stop was based on a reasonable suspicion that a crime was actually occurring. Rather, the Government's argument is based on the incorrect premise that an officer's inability to read some letters and numbers on a temporary registration, by itself, gives rise to reasonable suspicion to stop a vehicle.

For there to be reasonable suspicion that criminal activity is occurring, an officer must be able to point, at least generally, to the actual criminal activity. That determination "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time" *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999). In many cases, the contemporaneous belief standard favors the Government because even if an officer is mistaken about facts or law, a stop will not be suppressed if the officer had a reasonable suspicion of criminal activity at the time. *See United States v. Sanchez*, 572 F.3d 475, 479 (8th Cir. 2009). Here, however, the opposite is true. At the time of the stop, Del Valle had no suspicion, reasonable or otherwise, that Rode or McLemore were engaged in any criminal activity related to the temporary registration sticker.[8] The stop was made simply because officers wanted to investigate other crimes. This is a classic case of a pretextual detention that was not supported by valid reasonable

---

[8] Additionally, Del Valle had previously seen the car on numerous occasions. She was given the chance to examine the car at low speed when it was parked. Although she testified that had no memory of previously looking at the temporary registration sticker, I find it to be likely that she knew the temporary registration card was valid. However, because the Government has failed to prove that Del Valle actually suspected criminal activity at the time of the stop, I need not reach the issue of whether she had specific prior proof that no crime was being committed.

suspicion. *Eldridge*, 984 F.2d at 947. Accordingly, the defendants' motions to suppress must be granted.

As an alternative finding, I find that Del Valle's testimony is not credible. In *Givens*, the Eighth Circuit wrote:

> Officer Baughan credibly testified that his suspicion arose because he could not determine whether the paper affixed to the rear window was a valid temporary registration card. In his experience, temporary registration cards are generally legible when observed from his patrol car and Officer Baughan testified that he had on prior occasions been able to read temporary registration cards at nighttime.

*Givens*, 763 F.3d at 990. Here, by contrast, Del Valle testified that she could not see the temporary registration from a distance of seven to ten feet. She also testified that she could not read the temporary sticker, which was affixed in the normal place on a normal, non-tinted rear windshield. She further testified that she could not read the tag even though she was driving in an urban area, which had street lights, and she was in a vehicle that was shining both headlights and "likely" a spotlight on the defendants' vehicle. Tr. at 42. I find this testimony to be incredible. Common sense and the exhibits presented in this case refute that idea that Del Valle could not read the temporary registration from a mere seven to ten feet away.

In finding Del Valle to be credible, Judge Scoles cited defendants' exhibit E, which contains two pictures of the BMW from the night of the stop. I do not find these images to be supportive of Del Valle's testimony. They are of poor quality, meaning they are not representative of what would have been visible to an officer located a few feet behind the vehicle.[9] Moreover, despite the poor image quality it is clear that the document hanging in the BMW's back window is a temporary registration with the date "07-29-

---

[9] Also compare defendants' exhibit F, the dealer advertisement plate, with the one in the top photograph of exhibit E. Even though the dealer plate is directly in front of the camera, with vehicle headlights pointed directly at it, with no angle, it is almost completely obscured.

16" written in large numerals. Accordingly, I do not find Del Valle's testimony that she could not read the temporary registration to be credible. Without that testimony, there is no possible basis for any reasonable suspicion of criminal activity that could have supported the traffic stop in this case.[10]

## C. *Extension of the Stop*

Because I have found that the initial stop was not lawful, I need not address McLemore's alternative argument that it was unlawfully extended.

## IV. CONCLUSION

1. For the reasons set forth herein, I **decline to adopt** the Report and Recommendation (CR16-2048, Doc. No. 44; CR16-2050, Doc. No. 33) in which then-Chief Magistrate Judge Scoles recommends that I deny defendants' motions to suppress evidence.

2. The defendants' objections (CR16-2048, Doc. No. 51; CR16-2050, Doc. No. 36) to the Report and Recommendation are **sustained**.

3. The defendants' motions to suppress (CR16-2048, Doc. No. 27; CR16-2050, Doc. No. 19) are **granted**. All evidence and statements obtained as a result of the stop of the defendants' vehicle and search of their persons on July 1, 2016, including but not limited to any evidence obtained pursuant to search warrants issued as a result of the stop and search, are hereby **suppressed**.

4. Because I have found that the defendants' motions to suppress should be granted, I hereby **reserve ruling** on the Reports and Recommendations (CR16-2050,

---

[10] For the reasons explained by Judge Scoles, I reject the Government's argument that prior suspicious activity could give rise to an alternate rationale to stop the BMW on the night of July 1, 2016. *See* CR16-2050, Doc. No. 33 at 12, n.11.

Doc. No. 46; CR16-2048, Doc. No. 64) in which Chief Magistrate Judge Williams recommends that I accept defendants' conditional pleas of guilty.

5. Judge Williams shall conduct status conferences regarding these cases to determine what further proceedings may be appropriate in light of the rulings set forth herein.

**IT IS SO ORDERED.**

**DATED** this 28th day of February, 2017.

_____
LEONARD T. STRAND
CHIEF UNITED STATES DISTRICT JUDGE